**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

RAYMOND D. OLIVER,

     Plaintiff,

                                Case No. 09-11040

v.                              Hon. Lawrence P. Zatkoff

NATIONAL LIFE INSURANCE
COMPANY,

     Defendant.

_____/

**OPINION AND ORDER**

AT A SESSION of said Court, held in the United States Courthouse,
in the City of Port Huron, State of Michigan, on November 22, 2011.

PRESENT: THE HONORABLE LAWRENCE P. ZATKOFF
UNITED STATES DISTRICT JUDGE

**I. INTRODUCTION**

This matter is before the Court on Defendant's Motion for Summary Judgment [dkt 29] and

Plaintiff's Motions for Summary Judgment [dkts 30 & 31].[1]  The parties have fully briefed the

motions.  The Court finds that the facts and legal arguments are adequately presented in the parties'

papers such that the decision process would not be significantly aided by oral argument.  Therefore,

pursuant to E.D. Mich. L.R. 7.1(f)(2), it is hereby ORDERED that the motions be resolved on the

---

[1]  Both parties filed an Ex Parte Motion for Leave to File Excess Pages [dkts 27 & 28], requesting
to extend the page limits of their motions and briefs.  In doing so, Plaintiff filed a motion and brief
conforming to the local rules [dkt 31] and a nonconforming motion and brief [dkt 30].  Because
neither party disputes such extensions and the Court finds the additional pages appropriate in this
case, the Court grants each parties' Ex Parte Motion.  Furthermore, having granted Plaintiff's
extension, the Court will refer to his nonconforming Motion for Summary Judgment in this Opinion
and Order.

briefs submitted.  For the reasons set forth below, Plaintiff's and Defendant's Motions for Summary

Judgment are DENIED.

## II.  BACKGROUND

On January 16, 2009, Plaintiff Raymond Oliver ("Plaintiff") filed this action against

Defendant National Life Insurance Company ("Defendant"), alleging that Defendant wrongly

terminated monthly disability income insurance benefits under National Life policy number

D2059329 ("the Policy").

### A.  THE POLICY

Defendant issued the Policy to Plaintiff providing "Total Disability" monthly benefits in the

amount of $11,000, effective January 8, 1988.  The Policy defines "Total Disability" as follows:

> Total Disability. The insured shall be deemed totally disabled only if
> the Insured . . . is unable to perform the material and substantial
> duties of the Insured's occupation due to . . . accidental injury . . . or
> . . . sickness . . .
> * * *
> Occupation means the occupation of the Insured at the time such
> disability begins.

The Policy requires an insured to submit written proof of disability within 90 days of the end

of the period that Defendant is liable:

> Proof of Disability.  Written proof must be given to us at our Home
> Office within 90 days after the end of the period for which we are
> liable.  Failure to give proof within the time required shall not reduce
> any claim if it was not reasonably possible to give proof within such
> time.  However, proof must be given not later than one year from the
> time proof is otherwise required, except in the absence of legal
> capacity.

As part of the Policy, Plaintiff also acquired a Residual Disability Rider ("the Rider"), which

provides for "Partial Disability" benefits.  The Rider will pay a Residual Disability Monthly Income

benefit if the insured becomes partially disabled due to accidental injury or sickness.  The Rider

defines "Partial Disability" as follows:

> Partial Disability. The Insured shall be deemed partially disabled only
> if, due to accidental injury or due to sickness, the Insured is not able:
>
> 1. to perform one or more of the important daily duties of the
> Insured's occupation as defined in this policy; or
>
> 2. to engage in the Insured's occupation as defined in this policy for
> as much time as was usual prior to the start of disability.
>
> For the Insured to be deemed partially disabled:
>
> 1. such disability must result in a Loss of Earnings per Month of at
> least 20% of Adjusted Prior Average Earnings per Month; and
>
> 2. the Insured must be under the prudent care of a licensed physician.
> The physician must be someone other than the Insured.

The Rider also provides that Plaintiff must prove his "Loss of Earnings per Month" to

Defendant's satisfaction, and, at Defendant's expense, it has the right "to examine the Insured's

financial records, including tax returns,"as Defendant "may reasonably require while a claim is

pending or benefits are being paid."

### B. PLAINTIFF'S OCCUPATION

Plaintiff, as part owner, was the President and General Manager of Bristol Steel & Conveyor

Corp. ("Bristol Steel"), a steel construction business.  Plaintiff typically worked 70 to 80 hours per

week.  When describing his job duties, Plaintiff broke them down into two categories—field and

shop functions and office functions.  His field and shop duties comprised 70% of his working hours.

According to Plaintiff, such duties included: job site management, oversight and progress on

construction projects, interaction and meetings with job site superintendents, review material

management, operate machinery and equipment, review project changes and negotiate orders, climb

3

ladders and stairs to inspect, direct employees, walk steel while the decking was not in place, drive

to and from sites, and fabricate.  The remaining 30% of his hours were spent handling the office

work, including executive administration, negotiation and preparing bids.

### C.  PLAINTIFF'S ACCIDENT

On February 4, 2004, Plaintiff was returning to the office in his vehicle when another driver

crossed the centerline of M-15 and struck Plaintiff's vehicle.  Plaintiff suffered significant injuries

including trauma to multiple locations, left acetabular fracture, left open patella fracture, left

olecranon fracture, right tibia/fibula fracture, left pubic ramus fracture, and multiple lacerations.

Plaintiff underwent surgical procedures, including procedures on his hip and tibia.

### D.  CORRESPONDENCE BETWEEN THE PARTIES

After the crash, Plaintiff was unable to return to work due to the injuries suffered in the

vehicle crash.  Several individuals, including a new President, were hired to perform the field, shop,

and office duties.  Plaintiff submitted a claim to Defendant for Total Disability benefits on May 12,

2004.  Defendant acknowledged receipt of the claim and assigned the claim to its Disability Benefits

Specialist ("DBS") Lorraine Beane.  Beane's notes of her initial telephone discussion (occurring on

May 27, 2004) with Plaintiff describe his injuries:

> He cannot walk yet.  He uses a wheelchair.  He says he is in pain
> 24/7.  Pain med is a morphine patch.  His recovery is slow.  Last
> week he developed an infection in his right leg.  It was treated with
> IV antibiotics.  He has a nurse at his home 24 hours a day.  He said
> just getting out of bed and into the wheelchair to go to the bathroom
> makes him feel like he worked half a day.  He will most likely need
> a left hip replacement after he recovers from his injuries.  He is the
> president and COE [sic] of a construction company.

On June 25, 2004, Defendant approved Plaintiff's claim for Total Disability benefits, finding

that he was totally disabled as of February 5, 2004.  Defendant paid benefits to Plaintiff according

4

to the Policy.  On September 22, 2004, Defendant requested copies of Plaintiff's personal and business federal tax returns.  In the letter, Defendant also stated:

> [i]n anticipation of your returning to work and qualifying for partial disability benefits, please provide us with copies of the following financial records so that we may calculate your prior monthly earnings[:]
>
> 1. profit and loss statements for the months August 2003 through January 2004[, and]
>
> 2. personal and business federal income tax returns, including all W-2's, schedules and attachments, for the years 1999 through 2003.

Plaintiff did not submit the requested information.

On January 27, 2005, Defendant told Plaintiff that "[t]o date we have not received copies of your 2003 personal and business federal income tax returns and would appreciate [you] sending them as soon as possible."  On February 14, 2005, Plaintiff's accountant sent Defendant only Plaintiff's 2003 personal tax returns.  Six months later, Dr. Balaszy, Plaintiff's orthopedic surgeon, released Plaintiff to return to work part time (2 hours per day).  Plaintiff informed Shawn Smith, a DBS for Defendant, that he returned to work, spending a few hours every couple of days in the office.  In a letter dated April 4, 2006, Smith wrote to Plaintiff that "it appears that your [pre-disability] occupational duties include office work," and therefore the "claim would be more appropriately viewed under the Partial Disability provisions" of the Policy, "beginning the date of your release to return to work, August 10, 2005."

By a letter dated April 28, 2006, Smith again explained that because Plaintiff had returned to performing office work at Bristol, which was 20% to 30% of his pre-disability duties, his claim should be viewed as one for partial disability benefits.  Smith again requested Plaintiff to provide specific tax returns and financial records to Defendant.  Smith made an additional request for tax

returns and financial records on May 26, 2006.  On June 6, 2006, Defendant informed Plaintiff "that while your claim is being evaluated under the Partial Disability provision of your policy, and pending receipt of the financial documentation requested in our letters of April 4th and May 26, 2006, the [payments] are being made under Reservation of Rights."   Defendant also advised that "we want to be of service to you and ask that you submit the financial documentation to our office no later than June 30, 2006."

Thereafter, a series of letters were exchanged between Smith and Plaintiff's counsel, Damien Frasier, discussing whether Plaintiff was totally disabled and if Defendant was entitled to the financial information pursuant to the Policy.  On August 1, 2006, Plaintiff's counsel pointed out to Defendant that it was not entitled to a copy of the requested financial information.  Plaintiff's counsel, however, offered to produce the disputed information if Defendant executed a confidentiality agreement.  Smith responded on August 10, 2006, indicating that the requested information was necessary and advising that Defendant would not sign the non-disclosure agreement unless certain changes were made.

On December 29, 2006, Defendant sent Plaintiff a 30-day warning letter, indicating that Plaintiff must submit the requested financial information within 30 days or Plaintiff's claim would be closed.  Despite the party's disagreement, Defendant continued to pay Plaintiff's claim for benefits with a reservation of rights until January 2007.  Having not received the requested financial information, Beane sent a letter dated January 30, 2007, terminating any further benefits:

> Since we have received none of the (financial) information needed to evaluate Mr. Oliver's claim under the Residual Disability provisions in his policy, we are closing Mr. Oliver's disability claim as of January 5, 2007. Please advise Mr. Oliver that the waiver of premium benefit has ended, and he is again responsible for the payment of premiums for his policy.

6

* * *

> However, if you disagree with our determination and intend
> to appeal this claim decision, you must submit a written appeal.

When Defendant terminated Plaintiff's claim for benefits in January 2007, Plaintiff resumed

paying his policy premiums. As such, the Policy has remained in effect.

### E. Plaintiff's Appeal of Defendant's Claim Determination

Plaintiff's counsel then submitted a written appeal of the claims decision on March 23, 2007.

In a letter dated April 17, 2007, Defendant's Lead Appeals Specialist, Richard Enberg, informed

Plaintiff that his claim file was directed to the Worcester Benefits Center Compliance unit for an

appellate review. He further stated, "Every appeal is unique and the time frames to complete a

review will vary. We will make every effort to reach a determination on this appeal as soon as

possible. Upon completion of my initial review, I will contact you and advise you of the status of

your client's appeal."

As part of Enberg's initial review, he obtained a July 16, 2007, Field Report created by Mike

Koslovich; additional financial information, which are not specifically identified; additional medical

records; and vocational rehabilitation reviews. On March 25, 2008, Enberg informed Plaintiff's

counsel that he "cannot say with 100% accuracy that [Plaintiff] would be residually disabled,

however [Enberg] cannot say with 100% accuracy that he is totally disabled either." Without

making a decision either way, Enberg referred the claim to the "resolution team." During this case,

Plaintiff submitted additional financial information to Defendant on multiple occasions including,

most recently, his personal and business tax returns from 1999–2009.

### F. Procedural Background

With Plaintiff's appeal unresolved, Plaintiff filed this case in the Michigan Genesee County

7

Circuit Court on January 13, 2009. On March 19, 2009, Defendant timely removed the case to this Court on the basis of diversity of citizenship.[2] On January 13, 2010, the Court determined that Plaintiff's state-law claims were not preempted by the Employee Retirement Income Security Act, 29 U.S.C. § 1001 *et seq*. Following that opinion and order, Plaintiff filed his second amended complaint [dkt 16] ("the Complaint"). Plaintiff's Complaint asserts a claim for breach of the Policy, a claim for intentional infliction of emotional distress ("IIED"), and a claim for fraud and exemplary damages. Defendant then moved for partial dismissal of the Complaint pursuant to Fed. R. Civ. P. 12(b)(6). In resolving that motion, the Court dismissed Plaintiff's claim for IIED and fraud. The remaining claim before the Court is Plaintiff's claim for Defendant's breach of the Policy. With respect to that claim, both parties have filed Motions for Summary Judgment.

As to Plaintiff's Motion for Summary Judgment, he requests that the Court find that there is no genuine dispute of fact that he is totally disabled under the Policy. In the alternative, he requests that this Court grant a declaratory judgment requiring Defendant to comply with the Policy and evaluate Plaintiff's claim for disability benefits.

As to Defendant's Motion for Summary Judgment, Defendant requests summary judgment on Plaintiff's claim because, according to Defendant, there is no genuine dispute of fact that Plaintiff has returned to part-time work and is no longer totally disabled. Additionally, Defendant asserts that any claim Plaintiff may assert for Residual Disability benefits under the Policy is barred because Plaintiff failed to provide proper documentation as required and requested.

### III.  STANDARD OF REVIEW

---

[2] Plaintiff served the Summons and Complaint on Defendant on February 27, 2009.

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  *See also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) ("[T]he plain language of Rule 56[] mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.").  A party must support its assertions by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or;
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).  "The court need consider only the cited materials, but it may consider other materials in the record."  Fed. R. Civ. P. 56(c)(3).

The moving party bears the initial burden of demonstrating the absence of any genuine dispute as to a material fact, and all inferences should be made in favor of the nonmoving party.  *Celotex*, 477 U.S. at 323.  The moving party discharges its burden by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case."  *Horton v. Potter*, 369 F.3d 906, 909 (6th Cir. 2004) (citing *Celotex*, 477 U.S. at 325)).

Once the moving party has met its initial burden, the burden then shifts to the nonmoving party, who "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  "[T]he mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient

9

[to defeat a motion for summary judgment]; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

## IV. ANALYSIS

### A. THE POLICY LANGUAGE

The Court must first analyze the language at issue in the Policy. Under Michigan law, "an insurance contract must be enforced in accordance with its terms."[3] *Henderson v. State Farm*, 460 Mich. 348, 354 (1999). The commonly used meaning of the terms controls, unless the insurance contract expressly defines them. *Grp. Ins. Co. v. Czopek*, 440 Mich. 590, 596 (1992). If a term or provision is ambiguous, the insurance contract must be construed "in favor of the insured." *Clevenger v. Allstate Ins. Co.*, 443 Mich. 646, 654 (Mich. 1993). The Michigan Supreme Court has explained the following while analyzing whether a provision was ambiguous:

>  A contract is said to be ambiguous when its words may reasonably be understood in different ways.
>
> If a fair reading of the entire contract of insurance leads one to understand that there is coverage under particular circumstances and another fair reading of it leads one to understand there is no coverage under the same circumstances the contract is ambiguous and should be construed against its drafter and in favor of coverage.

*Raska v. Farm Bureau Mut. Ins. Co. of Mich.*, 412 Mich. 355, 362 (1982); *see also Gorham v. Peerless Life Ins. Co.*, 368 Mich. 335, 343 (1962); *Century Indem. Co. v. Schmick*, 351 Mich. 622,

---

[3]The Court's jurisdiction over this case is based on diversity jurisdiction. As such, the Court must apply the choice-of-law provisions of the forum state, *i.e.*, Michigan's choice-of-law provisions. *NILAC Int'l Mktg. Grp. v. Ameritech Servs., Inc.*, 362 F.3d 354, 358 (6th Cir. 2004). Applying such provisions, the Court will apply Michigan substantive law because there is neither evidence of a substantial relationship between another state and the Policy nor evidence that Michigan law would conflict with another state's law, of which that state has an interest greater than Michigan. *See id.*

626–27 (1958).   Whether or not a term or provision is ambiguous is a question of law for the court. *Equitable Life Assurance Soc'y v. Poe*, 143 F.3d 1013, 1016 (6th Cir. 1998).  In construing the terms, the court may consult dictionaries to determine the ordinary meaning. *Chandler v. Cnty. of Muskegon*, 467 Mich. 315, 320 (2002).

Defendant maintains that its Total Disability provision must be read to mean that Plaintiff is deemed "totally disabled" if he is unable to perform *all* of the material and substantial duties of his occupation.  Defendant supports its reading with the fact that the Policy contains a Total Disability provision and a Residual Disability Provision.  According to Defendant, if the Court were to construe the Total Disability provision in any other manner, the Residual Disability provision would be meaningless.  Contrary to Defendant's argument, Plaintiff contends that the Total Disability provision is ambiguous and should be construed to mean that Plaintiff is deemed totally disabled if he is unable to perform *most or a majority* of the material duties of his pre-disability occupation.

Guided by the principles enunciated by the Michigan Supreme Court, the Court concludes that the Policy language at issue is ambiguous.  The Total Disability provision defines total disability as "the Insured . . . is unable to perform the *material and substantial duties* of the Insured's occupation."  As the parties contend in their briefs, one fair reading of this provision leads an insured to be totally disabled if the insured is unable to perform *all* material duties of his occupation.  Another fair reading of this provision leads an insured to be totally disabled if the insured is unable to perform *most or a majority* of the material duties of the insured's occupation.  The Policy provision, thus, may be reasonably understood in at least two ways—one providing coverage to Plaintiff and one providing no coverage to Plaintiff—thus, the Court finds it ambiguous. *See Raska*,

11

412 Mich. at 362.

Having determined that the provision is ambiguous, the Court must construe the provision, doing so in favor of the insured.[4]  *See Gorham*, 368 Mich. at 343 ("If there is any doubt or ambiguity with reference to a contract of insurance which has been drafted by the insurer, it should be construed most favorably to the insured.").  In construing the relevant terms in the Total Disability provision, "material" is defined as "significant" or "essential."  Black's Law Dictionary (9th ed. 2 0 0 9 ) ;   *s e e*   M e r r i a m - W e b s t e r ' s   O n l i n e   D i c t i o n a r y , http://www.merriam-webster.com/dictionary/material (defining, in relevant part, "material" as "having real importance or great consequences").  "Substantial" is defined as "important," "essential," and "considerable in quantity[—]significantly great."  Merriam-Webster's Online Dictionary, http://www.merriam-webster.com/dictionary/substantial.

Because the Court must give effect to each term in the provision and not construe a term to be meaningless, "material" and "substantial" may not both be construed to have the same meaning, that is, "important" or "essential."  *See Taylor v. BCBSM*, 205 Mich. App. 644, 649 (1994) (according to Michigan law an "insurance contract should be read and interpreted as a whole"); *Allstate Ins. Co. v. Freeman*, 432 Mich. 656, 673–74 (1989) (stating that "[n]o word in a contract should be rejected as surplusage if it serves some reasonable purpose").  Rather, the Court finds that "material" must be construed to mean "important" and "essential", whereas "substantial" continues to provide a reasonable purpose if it is construed to mean "significant in quantity."

The Court, however, declines to find "significant in quantity" to mean *only* "all," as such an interpretation narrows the provision far past the literal words in the provision and had Defendant

---

[4]  The Policy and Rider do not expressly define the terms "material" and "substantial."

meant "all" "material" duties, it could have expressly stated such.  *See Giampa v. Trustmark Ins. Co.*, 73 F. Supp. 2d 22, 27–28 (D. Mass. 1999) (stressing that total disability clauses should not be read so literally that the insured's ability to perform some business duty, no matter how small, would prevent a finding of total disability); *Pomerance v. Berkshire Life Ins. Co.*, 654 S.E. 2d 638, 642 (Ga Ct. App. 2007) (construing similar insurance contract language and finding an insured is totally disabled if the insured is unable to "perform most or a vast majority of the material duties of the insured's occupation.").  This interpretation is in favor of the insured and adheres to the principles of Michigan law.

While the Court acknowledges that the Policy also contains a Residual Disability provision providing that an insured can receive benefits if the "Insured is not able . . . to perform one or more of the important daily duties of the Insured's occupation," the Court does not find that its interpretation of the Total Disability provision makes the Residual Disability provision meaningless. *See Pomerance*, 654 S.E. 2d at 642 (construing similar provisions and finding that a reading of the partial disability provision and the total disability provision together "creates a continuum of disability.") (citation omitted).  The provisions can be read together to provide the point at which a disabled insured unable to perform a significant amount of the important and essential duties is totally disabled; otherwise, the insured is likely partially disabled.  Accordingly, to be deemed "totally disabled" under the Policy, the Court construes the provision as follows: the insured must be unable to perform a *significant amount of the important and essential duties* of the insured's occupation.

### B.  GENUINE DISPUTE OF FACT AS TO WHETHER PLAINTIFF IS "TOTALLY DISABLED"

Plaintiff argues that he is totally disabled because he has never been able to resume his field

13

and shop duties, which comprise between 70% to 80% of his pre-disability occupational duties. Plaintiff further claims that while he has returned to work for 4 to 6 hours per day, five days a week, prior to the crash, Plaintiff worked 10 to 12 hours per day, 6 to 7 days a week.  In response, Defendant asserts that there is no dispute that Plaintiff is currently performing some of the important duties of his occupation four to six hours per day, five days a week.  Defendant therefore concludes that Plaintiff is not "totally disable" under the Policy.

The Court finds that a genuine dispute of material fact exists as to whether Plaintiff's return to work for 4 to 6 hours per day, five days a week, doing limited office work deems Plaintiff totally disabled.  The parties to do not dispute that, prior to the crash, Plaintiff worked 60 to 80 hours a week on field, shop, and office duties.  His field and shop duties comprised approximately 70% of his duties, while his office duties consumed the remaining 30% of his time.  Plaintiff set forth the description of his pre-disability occupational duties, which Defendant does not dispute, as follows:

> 1.  Office Functions which include: preparation of quotes; hiring/firing decisions; customer relations; receivable/payable oversight; salary/pay review and determinations; negotiations with unions; benefit review and determinations; accounting oversight' and, negotiations with vendors.
>
> 2.  Field and Shop Functions which include: job site management, oversight and progress for construction projects; interaction and meetings with job site superintendents; material management review, direction and installation; operation of machinery and equipment; review project changes and negotiate change orders; climb ladders/stairs to inspect, direct employees and work; walk steel when decking not in place; drive to and from job sites; and, fabrication.

The July 16, 2007, Field Report created by Koslovich, who interviewed Plaintiff and several of Plaintiff's employees, supports Plaintiff's description of his pre-disability occupational duties. Koslovich's report also states that Plaintiff's pre-disability duties were split "1/3 in the field, 1/3 in

14

the shop, and 1/3 in the office."

Plaintiff now works 20 to 30 hours a week on preparing and reviewing estimates and bids.

As to Plaintiff's current occupational duties, Koslovich's report indicates that:

> Mr. Oliver is working from 24 to 32 hours per week. He spends 90% of his time now reviewing estimates, making job schedules/sequencing, reviewing reports, and doing office clerical work. He reviews shop drawings and sends emails to engineers. He reviews a chart prepared by John Cooper about buildings under construction. He reviews financial statements and the minutes from staff meetings. . . . He stated that now he is unable to work in the field or the shop, and that his office work is limited to 4–6 hours a day.

Plaintiff's employee, John Cooper, confirms the information contained in Koslovich's field report

and the statements made by Plaintiff.

In comparing Plaintiff's pre-disability duties and post-disability duties, Plaintiff testified that

preparing accurate estimates and bids are an important part of the building construction process;

Plaintiff, however, did not assert that his part-time work preparing estimates and bids was a

significant amount of his pre-disability occupational duties.   And, Plaintiff's total time spent

performing office work prior to the crash was only 30% of his time.   Plaintiff has not even resumed

performing all of his pre-disability office duties, including hiring and firing, customer relations,

salary and pay rate determinations, negotiations with unions, benefit review and determination, and

negotiations with vendors.   These were all duties Plaintiff described that he performed as part of his

office duties.   Thus, in light of the evidence produced to the Court, reasonable jurors could differ

on whether Plaintiff's current office duties (*i.e.*, producing, reviewing, and approving estimates and

quotes) are a "significant amount" of all of Plaintiff's pre-disability duties.   *Cf. Yahiro v.*

*Northwestern Mut. Life Ins. Co.*, 168 F. Supp. 2d 511, 517, 518 (D. Md. 2001) (reviewing a Total

15

Disability provision containing the phrase "unable to perform the principal duties of his occupation," and finding that the plaintiff's non-surgical treatment of patients and his teaching duties consumed a large percentage of his time and generated a significant portion of his income and thus represented a substantial and material part of his pre-disability practice of orthopaedics); *see Giampa*, 73 F. Supp. 2d at 29 (finding that a chiropractor who was unable to engage in 85% to 95% of his previous substantial and material duties, but could perform management duties was a triable issue of fact for the jury to decide whether such management duties were substantial and material duties of his pre-disability occupation).

In addition to the Court's own review of the factual record, the Court finds it significant to note that Defendant's own appeals specialist, Richard Enberg, who had reviewed the entire claim file, could not definitively conclude whether Plaintiff was either totally disabled or residually disabled. As such, a genuine dispute of fact exists as to whether Plaintiff can perform a significant amount of the important and essential duties of his pre-disability occupation duties. Accordingly, the Court denies Plaintiff's Motion for Summary Judgment and Defendant's Motion for Summary Judgment as to whether Plaintiff is "totally disabled" under the Policy.

### C. DEFENDANT'S REQUEST FOR SUMMARY JUDGMENT ON ANY CLAIM UNDER THE RESIDUAL DISABILITY BENEFITS PROVISION

Defendant does not dispute whether Plaintiff is partially disabled. Rather, Defendant asserts that, even if Plaintiff were to file a claim for Residual Disability benefits, his failure to provide Defendant with necessary financial records Defendant has requested bars his claim. Defendant explains that submission of the financial records is a condition precedent to Plaintiff's right to receive such benefits. Having failed to satisfy the condition precedent, even if Plaintiff is deemed Partially Disabled, Defendant concludes he is not entitled to Residual Disability benefits.

16

On the other hand, Plaintiff disputes that he was required to submit the requested financial records to Defendant. Plaintiff maintains that he made a claim for Total Disability benefits and according to the Policy, he is not required to submit financial records for a claim for Total Disability benefits. According to Plaintiff, because Defendant has not resolved his claim for Total Disability benefits, he is not required to produce his financial information. Plaintiff further contends that Defendant's representations that his financial information was not necessary until after it resolved Plaintiff's appeal should estopp Defendant from now claiming that Plaintiff failed to timely submit the disputed financial information.

Reviewing the record, the parties' motions and briefs, and the case law and exhibits cited and contained therein, the Court finds Plaintiff is not barred from a claim for Residual Disability benefits based on his failure to disclose certain financial records. It is undisputed that Plaintiff filed a claim for Total Disability benefits on May 12, 2004, pursuant to which Defendant began paying Plaintiff benefits as set forth in the Policy. It is also undisputed that the Policy, excluding the provisions in the Rider,[5] requires Plaintiff to submit proof of his disability either by filling out forms supplied by Defendant or by submitting written proof "of the occurrence, and of the nature and extent of the disability for which the claim is made." This language in the Policy or any other provision regarding Total Disability benefits requires Plaintiff to submit the requested financial documents. Defendant did not even request Plaintiff's financial documents until after it believed Plaintiff was no longer totally disabled. Plaintiff, however, disputed Defendant's conclusion that Plaintiff was only partially

---

[5]  While the Court acknowledges that the provisions in the Policy govern the Rider according to a provision contained in the Rider, no similar provision is found in the Policy that incorporates the provisions of the Rider into the Policy. The provision in the Rider expressly indicates that "[t]he terms of the policy shall apply to [the] rider unless the rider states otherwise," while stating nothing with respect to the effect of the terms in the Rider on the Policy.

disabled and declined to provide the requested financial documents. To that extent, Plaintiff appealed Defendant's denial of Plaintiff's total disability claim. As such, the Court finds that under the Policy Plaintiff was neither required to submit his financial documents to Defendant to receive his Total Disability benefits nor to have the appeal of the denial of his benefits reviewed.

Furthermore, Defendant's assertion that Plaintiff's failure to timely submit financial documents has barred Plaintiff's Residual Disability Benefits is unavailing. After Plaintiff's Total Disability claim was terminated, he appealed the decision on March 23, 2007. He requested Defendant to conduct an administrative appeal, which Beane advised Plaintiff he had the right to request in her January 30, 2007, letter terminating Plaintiff's benefits. While Defendant continued to request documents and conduct an investigation, Enberg, Defendant's appeals specialist, advised Plaintiff that the "results of the investigation will dictate whether or not we will need financial information." After a prolonged investigation, the appeal was referred to the "resolution team."

While the Court is not aware of what the status is of the claim with the "resolution team," it is undisputed that Defendant has not made a decision on Plaintiff's appeal. Defendant provides no explanation to the Court as to why a decision has not been made. Defendant only makes minimal reference in its pleadings to the interaction between Enberg and Plaintiff's counsel, concluding that the fact Defendant did not issue a decision on Plaintiff's appeal is irrelevant. Significantly, Defendant provides no legal support to justify its conclusion. In contrast, the Court does finds Enberg's interaction with Plaintiff's counsel and the fact that Defendant has made no decision on Plaintiff's appeal most significant. While Defendant attempts to argue that Plaintiff breached the conditions of the Policy, Defendant itself has failed to conform to its representations.

The Court highlights the following interactions between the parties which exemplify why

18

Defendant is not justified in asserting that Plaintiff failed to timely submit the requested financial information:

1. Plaintiff appealed Defendant's decision on March 23, 2007.

2. On April 17, 2007, Enberg advised Plaintiff's counsel that "[e]very appeal is unique and the time frames to complete a review will vary. . . . Upon completion of my initial review, I will contact you and advise you of the status of your client's appeal."

3. On May 25, 2007, Enberg's telephone memorandum regarding a conversation with Plaintiff's counsel indicates that Enberg advised Plaintiff's counsel of the following:

> It appears there is a dispute regarding submission of financial documentation. I stated that at this time we need additional information regarding Mr. Oliver's pre and post disability duties to confirm that this is in fact a residual disability. *The results of the investigation will dictate whether or not we will need financial information.*

(emphasis added).

4. In a letter dated July 18, 2007, Enberg indicated to Plaintiff's counsel that he was "in receipt of the report from our Field Representative, Mr. Mike Koslovich . . . [and] the additional financial information. I have forwarded this information to our vocational consultant for review. Once this review is complete, I will contact you . . . . Thank you for your patience while we continue our investigation of your

appeal."

5.  On March 25, 2008, Enberg spoke with Plaintiff's counsel.  Enberg advised Plaintiff's counsel that he was not able to determine with 100% accuracy that Plaintiff was either residually disabled or totally disabled.  Enberg then asked whether Plaintiff would be interested in an alternate resolution, which Plaintiff's counsel agreed to.

6.  On April 3, 2008, Enberg informed Plaintiff's counsel that the "resolution team" agreed to review Plaintiff's file.

7.  No other evidence indicates to the Court the status of Plaintiff's appeal, and the parties do not dispute that Defendant has never made a decision on Plaintiff's appeal.

Reviewing the highlighted facts, the interactions between the parties indicate that Enberg informed Plaintiff that he was not required to submit the financial information until Defendant completed its investigation.  Because Plaintiff reasonably relied on the representations of Defendant's employees, most significantly Enberg, the Court finds that Defendant is now estopped from denying that Plaintiff did not need to submit his financial information until his appeal was resolved, as allowing Defendant to deny such statements will prejudice Plaintiff. *See  Engel v. State Mut. Rodded Fire Ins. Co.*, 281 Mich. 520, 527 (1937) (holding under Michigan law, equitable estoppel arises "when one by his . . . representations, or admissions, . . . intentionally or through

20

culpable negligence induces another to believe certain facts to exist and such other rightfully relies and acts on such belief, so that he will be prejudiced if the former is permitted to deny the existence of such facts."); *see Fleckenstein v. Citizens' Mut. Auto. Ins. Co.*, 326 Mich. 591, 599–600 (1950) (applying *Engel* as the rule of law on equitable estoppel). Thus, because Defendant has failed to resolve Plaintiff's appeal and determine whether Plaintiff must submit the financial documentation, the Court does not find that Defendant is entitled to summary judgment with respect to whether a claim for Residual Disability benefits by Plaintiff is barred.

Furthermore, for Defendant to be relieved of its contractual duty to provide Residual or Total Disability benefits, it must establish that it was actually prejudiced from Plaintiff's failure to submit the requested financial documents. *See Koski v. Allstate Ins. Co.*, 456 Mich. 439, 444 (1998) ("[A]n insurer who seeks to cut off responsibility on the ground that its insured did not comply with a contract provision requiring notice immediately or within a reasonable time must establish actual prejudice to its position."). During this case, it appears that Plaintiff has provided the requested financial information to Defendant. Defendant does not demonstrate that it is actually prejudiced from receiving the financial records at this later date. *See West Bay Exploration Co. v. AIG Specialty Agencies, Inc.*, 915 F.2d 1030, 1036–37 (6th Cir. 1990) (explaining that prejudice occurs where the delay "'materially' impairs an insurer's ability to contest its liability to an insured or the liability of the insured to a third party"). As Plaintiff points out, his financial information, including his tax returns, contains the same information at the time Defendant requested the information as the information does when Plaintiff finally provided it to Defendant.

Under the circumstances, the Court neither finds that Defendant is prejudiced from having to resolve Plaintiff's appeal and review Plaintiff's financial information nor that the Policy would

bar Plaintiff's claim. Accordingly, Defendant's request for the Court to grant Defendant summary judgment on a claim by Plaintiff for Residual Disability benefits is denied.

### D. PLAINTIFF'S REQUEST FOR DECLARATORY JUDGMENT

Plaintiff also seeks a declaratory judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, and Fed. R. Civ. P. 57, declaring that Defendant has an obligation to consider Plaintiff's claim for disability benefits and that he is entitled to the amount of benefits as set forth in the Policy. Fed. R. Civ. P. 57 provides that the rules in 28 U.S.C. § 2201 govern the procedure for obtaining a declaratory judgment. Pursuant to 28 U.S.C. § 2201, "[i]n a case of actual controversy within [a court's] jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration." The Advisory Committee Notes state that "[a] declaratory judgment is appropriate when it will 'terminate the controversy' giving rise to the proceeding. Inasmuch as it often involves only an issue of law on undisputed or relatively undisputed facts, it operates frequently as a summary proceeding . . . . When declaratory relief will not be effective in settling the controversy, the court may decline to grant it." Fed. R. Civ. P. 57 Advisory Committee's Notes.

Because the Court has determined that a genuine dispute of fact exists with respect to whether Plaintiff is totally disabled, granting a declaratory judgment to require Defendant to review Plaintiff's total disability appeal will not "terminate the controversy" that gave rise to this case. *See Lowden v. Clare Cnty.*, No. 09-cv-11209, 2011 WL 3958488, at *14 (E.D. Mich. September 8, 2011) (denying a plaintiff's request for declaratory relief until other claims were resolved). As the Advisory Committee Notes state, "[w]hen declaratory relief will not be effective in settling the controversy, the court may decline to grant it." *See* Fed. R. Civ. P. 57 Advisory Committee's Notes.

22

As such, the Court does not find it appropriate to address Plaintiff's request for a declaratory judgment at this time. *See Manley, Bennett, McDonald & Co. v. St. Paul Fire & Marine Ins. Co.*, 791 F.2d 460, 462 (6th Cir. 1986) ("Under the Declaratory Judgment Act, the grant of declaratory judgment is discretionary with the trial court." (internal citation omitted)). Accordingly, Plaintiff's alternative request for a declaratory judgment is denied.

## V. CONCLUSION

Accordingly, for the reasons set forth above, IT IS HEREBY ORDERED that Plaintiff's Ex Parte Motion for Leave to File Excess Pages [dkt 27] is GRANTED.

IT IS FURTHER ORDERED that Defendant's Ex Parte Motion for Leave to File Excess Pages [dkt 28] is GRANTED.

IT IS FURTHER ORDERED that Defendant's Motion for Summary Judgment [dkt 29] is DENIED.

IT IS FURTHER ORDERED that Plaintiff's Motions for Summary Judgment [dkts 30 & 31] are DENIED.

IT IS SO ORDERED.

s/Lawrence P. Zatkoff
LAWRENCE P. ZATKOFF
UNITED STATES DISTRICT JUDGE

Dated:  November 22, 2011

23

CERTIFICATE OF SERVICE

      The undersigned certifies that a copy of this Order was served upon the attorneys of record by electronic or U.S. mail on November 22, 2011.

s/Marie E. Verlinde
Case Manager
(810) 984-3290